# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| JONATHAN KIMO SANTIAGO,<br><br>        Plaintiff,<br><br>    vs.<br><br>STATE OF HAWAI'I, COUNTY OF HAWAI'I – HAWAI'I POLICE DEPARTMENT, BRYSON MIYOSE, and KIMO VEINCENT, in their official and individual capacities,<br><br>        Defendants. | CIVIL NO. 16-00583 DKW-KSC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS** |

## <u>INTRODUCTION</u>

Shortly after 4:00 a.m. on November 1, 2014, four Hawaii County Police Department Officers responded to a 911 call from Linda Leong, who reported that her ex-boyfriend, Jonathan Kimo Santiago, was banging on the walls of her home and yelling at her to "open up."   Leong called 911 because she "could tell that Santiago was drunk" and had crashed his truck into the rock wall fronting her home. Officers Wyatt Kaili-Leong, Kimo Veincent, Cala Arnold, and Bryson Miyose arrived on-scene where the less-than-cooperative Santiago was eventually arrested—but not before sustaining injuries, including bruises on his arms and the

loss of his two front teeth upon impact with the ground.   Santiago, proceeding pro se, asserts that the manner of his arrest and police department practices were unlawful.   He brings claims against two of the responding Officers—Veincent and Miyose—and the County of Hawaii Police Department (the "County") for violations of federal and state law.   Defendants move for summary judgment on all claims.

Because Officer Miyose is entitled to qualified immunity, and because there are no genuine issues of material fact with respect to any theory of municipal liability against the County, these Defendants are entitled to summary judgment on Santiago's 42 U.S.C. § 1983 cause of action.   All Defendants also meet their summary judgment burden with respect to Santiago's related state law claims. Construing the facts in the light most favorable to Santiago, however, Officer Veincent has not demonstrated that his conduct was objectively reasonable under the circumstances or that he did not violate Santiago's clearly established Fourth Amendment rights, and accordingly, he is not entitled to qualified immunity on Santiago's Section 1983 claim.   The Court therefore grants in part and denies in part Defendants' Motion for Summary Judgment, as detailed below.

## BACKGROUND

### I.    Factual Background

Santiago alleges that Veincent is responsible for knocking out his front teeth after twice pinning him on the ground and "inflicting other bodily and psychological

injuries" during the course of arresting Santiago on November 1, 2014. *See* Am.

Mem. in Opp'n at 2, Dkt. No. 102. He also claims that Officers Miyose,

Kaili-Leong, and Arnold failed to protect him from Veincent's attack and "failed to

render adequate medical assistance to plaintiff after the assault." *Id.*[1] Although

the parties recite similar timelines concerning the primary incidents, their specific

versions of events diverge with respect to key occurrences, and they dispute the

conduct by Santiago and the arresting Officers during the course of his arrest.

Because many of the salient details of Santiago's arrest are disputed, the Court sets

forth the following chronology, noting the discrepancies in the parties' respective

recountings of events.

A.      <u>Santiago's November 1, 2014 Arrest</u>

On October 31, 2014, Santiago attended a concert at Coqui's Bar and Grill

that his employer, All Service Hawai'i, paid to sponsor. Pl.'s Ex. 2 at 11–13

(6/20/17 Santiago Dep. Tr.), Dkt. No. 103-2. According to Santiago, he ate before

arriving at 7:30 p.m., and consumed approximately five Heineken beers over the

course of the evening at Coqui's, before leaving at 1:45 a.m. 6/20/17 Santiago Dep.

Tr. at 12–13. At that point, he sat in his truck, "playing on [his] cell phone, texting

people," when he fell asleep. 6/20/17 Santiago Dep. Tr. at 14. According to

---

[1]Santiago failed to name Officers Kaili-Leong and Arnold as defendants, and, on November 21, 2017, the magistrate judge denied Santiago's Motion to extend deadlines to join additional parties and amend his pleadings. *See* Dkt. No. 14.

Santiago, he woke up approximately an hour later and decided to visit his former girlfriend, Linda Leong, before driving to his home in Keaau. *Id.* at 14. Per Santiago, while turning onto Leong's street, he "pressed his brake causing his truck tires to skid on the grass, hitting Leong's newspaper box, a small pine tree and a portion of her stonewall—all located where the truck skid to, incurring a minimal amount of damage." Am. Mem. in Opp'n at 5 (citing 6/20/17 Santiago Dep. Tr. at 15–17).

Leong's home is surrounded by a rock wall topped with a fence along with a locking gate and posted "No Trespassing" signs. Decl. of Linda Leong ¶ 3, Dkt. No. 85-4. Because the gate was locked that night, Santiago climbed over the fence onto Leong's property, as he had done in the past, "and called out to Leong saying he was sorry that he didn't call her in a while and that he wanted to talk to her." Am. Mem. in Opp'n at 5 (citing 6/20/17 Santiago Dep. Tr. at 15, 98). Leong was asleep inside the home, along with her five-year-old daughter, but was awakened around 4:00 a.m. by Santiago's arrival that was signaled by two "loud banging noises" that "sounded like a traffic accident or a car hitting something." Leong Decl. ¶¶ 2, 4. Leong looked outside and, upon seeing Santiago's truck in her driveway, closed all the windows and called 911 because she did not want him at her home. Leong Decl. ¶¶ 5, 7. Although they had been in an on-again, off-again relationship for two years, Leong states that she and Santiago had been broken up for nearly a year with

no contact before he arrived at her house at 4:00 a.m. on November 1, 2014.[2]

Leong Decl. ¶ 6.

Leong observed Santiago enter the enclosed fenced area of her home, and heard him yelling and crying, while asking her to "open up" and banging on the outside walls of the house. Leong Decl. ¶ 6. According to Leong, she "could tell that Mr. Santiago was drunk by the way he was talking and yelling and because he was having problems walking. [She] saw him stumbling and fall down more than once[.]" Leong Decl. ¶¶ 8, 9.

Hawaiʻi Police Department dispatcher Jason O'Brien received Leong's 911 call at 4:14 a.m. on November 1, 2014, classified it as an "Active-Domestic," and contemporaneously logged the information taken on the call in a Police Department Event Chronology. *See* Decl. of Jason O'Brien ¶¶ 4–5, 11, Dkt. No. 85-11; Defs.' Ex. K at 1 (Calls for Service Sheet Event No. P2014200502), Dkt. No. 85-12; Defs.' Ex. L at 1 (Event Chronology for Event No. P2014200502), Dkt. No. 85-13. O'Brien's chronology identifies which police officers were dispatched and their time of arrival at Leong's home. O'Brien Decl. ¶¶ 8–9, Exs. K and L. O'Brien first dispatched Officer Arnold at 4:15 a.m., then Officer Kaili-Leong immediately

---

[2]Santiago instead believes that Leong had ended their relationship about two months prior to the November 1, 2014 incident. *See* 6/20/17 Santiago Dep. Tr. at 128, Dkt. No. 85-3. He acknowledges that following the breakup, Leong made it clear that she did not want to see him. *Id*. at 130.

thereafter. O'Brien Decl. ¶ 12; Exs. K at 1–2 and L at 1. Officer Veincent was

dispatched to Leong's residence at 4:19 a.m., followed by Officer Miyose at 4:21

a.m. O'Brien Decl. ¶ 13; Exs. K at 1–2 and L at 1.

There is no dispute that Officer Kaili-Leong was the first officer to arrive at

the scene.[3] According to Santiago, when Kaili-Leong called out to him from

outside the fence near the roadway, Santiago "immediately came toward him and

climbed back over the fence." Am. Mem. in Opp'n at 6. Kaili-Leong asked

Santiago "what happened to [his] hand—why it was bandaged and [Santiago]

proceeded to tell him that [he] had stitches because [Santiago] cut [him]self cooking

about a week [prior]." Am. Mem. in Opp'n at 5 (citing 6/20/17 Santiago Dep. Tr. at

26). Santiago posits that he was "speaking calmly with Officer Kaili-Leong" when

"Officer Veincent pulled up with his police vehicle, jumped out, grabbed me by the

wrist[,] whacked me on my arm and slammed me to the ground with such excessive

force that [his] two front teeth were knocked-out from the roots." Am. Mem. in

Opp'n at 6–7 (citing 6/20/17 Santiago Dep. Tr. at 26–27, 31–35).

As described by Santiago, while on the ground, he "was handcuffed, [and

then] brought to his feet and [he] began to yell at Officer Veincent in his face

because he wanted to know why [he] was under arrest and why he was being

---

[3]Santiago explains that he erroneously "believed Officer Kaili-Leong was Officer Miyose and
stated such throughout his numerous complaints with the Police Commission[,] Office of
Professional Standards[,] and his Complaint filed October 20, 2016." Am. Mem. in Opp'n at 5.

assaulted." Am. Mem. in Opp'n at 7. Santiago told Veincent that "he didn't deserve" to be taken down to the ground, and asked Veincent, "why you did that for?" 6/20/17 Santiago Dep. Tr. at 34–35. According to Santiago, Veincent responded, "I thought you was going to head butt the other officer, okay." 6/20/17 Santiago Dep. Tr. at 35. When Santiago got up, he "got into Veincent's face," yelling at him from about one foot away, close enough that blood from Santiago's injured mouth got onto Veincent's face. 6/20/17 Santiago Dep. Tr. at 39–40. It was then that "Veincent grabbed [Santiago's] wrist and threw him to the ground again, stepping on plaintiff's back to make sure he stayed down—plaintiff went unconscious and sustained injuries to his elbows, wrist, knee and thigh." Am. Mem. in Opp'n at 6 (citing 6/20/17 Santiago Dep. Tr. at 39–41; Exs. 3–5).

Defendants' version of events includes significant details absent from Santiago's retelling, some of which he neither denies nor contradicts. When Officer Kaili-Leong arrived at Leong's residence, he observed Santiago looking into a window and called over the fence several times before Santiago finally noticed him. Decl. of Wyatt Kaili-Leong ¶¶ 10–11, Dkt. No. 85-5. As Santiago walked from the house toward the locked gate on the driveway, Kaili-Leong smelled a strong odor of alcohol and observed that Santiago was unsteady on his feet, "acting belligerently and constantly swearing." Kaili-Leong Decl. ¶¶ 11–12. As Kaili-Leong made initial contact with Santiago, who was still inside the enclosed

fence, Veincent arrived.   Kaili-Leong Decl. ¶ 14; Decl. of Kimo Veincent ¶ 8, Dkt.

No. 85-6.   Veincent observed Santiago stumbling, yelling and cursing and believed

he was "heavily intoxicated."   Veincent Decl. ¶ 9.   Leong, who was watching from

inside her home, saw Santiago unsuccessfully try to open and then try to climb over

the locked gate twice, almost falling to the ground.   Leong Decl. ¶ 12.   He then

walked over to the nearby rock wall, which was lower than the gate.   Leong Decl.

¶ 13.   Santiago, with some difficulty, climbed back over the rock wall and fence to

get outside Leong's property.   Leong Decl. ¶ 13; Kaili-Leong Decl. ¶ 15; Veincent

Decl. ¶¶ 9–10.   Officer Arnold, the third officer on the scene, arrived as Santiago

was climbing over the fence and observed Officers Kaili-Leong and Veincent

assisting Santiago.   Decl. of Cala Arnold ¶¶ 8–9, Dkt. No. 85-7.

When Santiago was back over the fence, he picked up a grapefruit-sized rock

with his right hand that he had knocked loose from the wall with his truck upon

arrival.   Kaili-Leong Decl. ¶ 15; Veincent Decl. ¶ 10.   Kaili-Leong instructed

Santiago to put the rock down, and Santiago responded by yelling, "Don't fucking

tell me what to do."   Kaili-Leong Decl. ¶ 15-17; Veincent Decl. ¶ 10.

According to the three Officers then present, Santiago continued to yell at

them and, unsteady on his feet, lost his balance and stumbled to the ground.

Kaili-Leong Decl. ¶ 17; Veincent Decl. ¶ 11; Arnold Decl. ¶ 10.   Veincent claims

that he helped Santiago back on his feet by lifting him under his right arm under his

shoulder area.   Veincent Decl. ¶ 11; *see also* Kaili-Leong Decl. ¶ 17; Arnold Decl.

¶ 11.   After Santiago again told Kaili-Leong, "Fuck you, don't fucking tell me what

to do," and aggressively stepped towards him, Kaili-Leong ordered Santiago to "step

back" in a loud, clear tone.   Kaili-Leong Decl. ¶¶ 18–19; Veincent Decl. ¶ 12;

Arnold Decl. ¶ 11.   When Santiago instead continued to lean forward, pushing his

head and body into Kaili-Leong's face and body area, Kaili-Leong tried to maintain

an arms-length distance using his open left hand, while keeping his right side and

firearm away from Santiago.   Kaili-Leong Decl. ¶¶ 18–19; Veincent Decl. ¶¶ 12–

13.   Santiago, however, did not step back, but "postured up, visibly tensing his arms

and suddenly and unexpectedly lunged at [Kaili-Leong] with his head toward

[Kaili-Leong's] face."   Kaili-Leong Decl. ¶ 20.   In order to avoid Santiago's

impact, Kaili-Leong stepped to his right and pushed Santiago away with his open

right hand placed on Santiago's back, and Santiago fell to the ground.   Kaili-Leong

Decl. ¶¶ 21.   Once Santiago was on the ground, Kaili-Leong secured his right arm,

placed him in handcuffs and instructed him to stop resisting.   Kaili-Leong Decl.

¶ 22.   Kaili-Leong saw that Santiago had "fallen on his front side striking his chin

on the cinder and gravel covered ground[,] [and] [w]hen [his] chin hit the ground, he

knocked out his two front teeth . . . caused bleeding in his mouth."   Kaili-Leong

Decl. ¶¶ 22–23.

Veincent heard Kaili-Leong instruct Santiago to "step back" and "stop pushing up against me," before seeing Santiago pull his body away, rear back, and give the appearance that he was going to assault Kaili-Leong. Veincent Decl. ¶¶ 12–14. Arnold saw virtually the same thing. She observed Santiago lunge with force toward Kaili-Leong to head butt him. Arnold Decl. ¶ 12. Veincent, standing to the right of Santiago, attempted to hold Santiago by his right arm, but could not prevent his fall, after he lunged and lost his balance. Veincent Decl. ¶¶ 15–16. Veincent then assisted Kaili-Leong by gaining control of Santiago's right arm, so that Kaili-Leong could place handcuffs on him, and he and Kaili-Leong pulled Santiago to his feet and placed him in a marked police vehicle. Veincent Decl. ¶¶ 17–18. There is no dispute that at no time did any Officer punch or kick Santiago, nor was pepper spray, a baton, taser, blunt object, or firearm used to subdue him. *See* Am. Mem. in Opp'n at 8; Kaili-Leong Decl. ¶ 24; Veincent Decl. ¶ 19.

Officer Miyose was the last officer to arrive, when Santiago was already on the ground and handcuffed, at approximately 4:35 a.m. Decl. of Bryson Miyose ¶¶ 7–8, Dkt. No. 85-8. Miyose observed that Santiago was bleeding from his mouth and that two of his teeth were missing. Miyose Decl. ¶ 10. Miyose also observed the damage to Leong's rock wall and newspaper box, an uprooted tree, tire marks in the grass, and the dents and scratches on Santiago's truck. Miyose Decl.

¶¶ 12–14.   When Miyose asked Santiago about the observed damage, Santiago told

him, "I didn't hit anything, I drove into the driveway nicely."   Miyose Decl. ¶ 15.

Miyose declares that Santiago "appeared to be highly intoxicated with red, glassy

eyes and was unruly."   Miyose Decl. ¶ 16.

Medics were requested and dispatched at 4:57 a.m. to meet Santiago at the

police station.   O'Brien Decl. ¶ 15; Defs.' Ex. L at 3 (Event Chronology for Event

No. P2014200502).[4]   Santiago arrived at the Pāhoa Police Station at 5:04 a.m. and

did not receive any medical treatment.   O'Brien Decl. ¶ 16; Ex. L at 3; *see also* Pl.'s

Ex. 18 (11/1/14 County Fire Dep't Incident Report), Dkt. No. 103-18 (noting "No

mutual/automatic aid was given or received" and "UPON ARRIVAL, NO EMS

NEEDED OR WANTED").   Officer Arnold, who was present during Santiago's

processing at the police station, observed that he fell asleep on several occasions and

that after he had slept for a period of time, "he became calm and cooperative."

Arnold Decl. ¶ 17.

Santiago was charged with Operating a Vehicle Under the Influence of an

Intoxicant; Refusal to Submit to a Breath, Blood or Urine Test; No No-Fault

Insurance; Attempted Assault in the Third Degree against Officer Wyatt

---

[4]Santiago notes a discrepancy in that Kaili-Leong's police report asserts that medics were called to
the scene, rather than to the police station.   *See* Am. Mem. in Opp'n at 8 ("Medics were not called
to the scene as stated [in] Officer Kaili-Leong['s] report dated November 7, 2014.") (citing Pl.'s
Ex. 17 at 2).

Kaili-Leong; and Criminal Trespass in the Second Degree. Defs.' Ex. M (12/5/14 Crim. Compl. in 3DCW-14-003356), Dkt. No. 85-14. On August 13, 2015, Santiago pled guilty to Criminal Trespass, was sentenced to a suspended term of 7 days in jail, fined $200, and ordered to stay away from Leong. Santiago's driver's license was also revoked for one year. Defs.' N (8/13/15 Judgement in 3DCW-14-003356), Dkt. No. 85-15; Defs.' Ex. O (5/22/15 Decision in No. 14-05693), Dkt. No. 85-16.

### B. May 1, 2015 Incident Involving Veincent

In addition to the November 1, 2014 incident, Santiago alleges an additional run-in with Veincent, on May 1, 2015, in which "Officer Veincent veered through on-coming traffic toward [Santiago] and his worker, causing them to run off the highway." Am. Mem. in Opp'n at 9. According to Santiago, on that date, he was on State Highway 11, also known as Volcano Road, in his company truck with worker Bradley Kanoa, when he saw a red Dodge Charger with a blue light on top swerving in their direction. Santiago filed a complaint against Veincent with the County Police Commission following the incident. Pl.'s Ex. 19 (5/26/15 Police Commission Compl.), Dkt. No. 103-19.

The County and Veincent dispute Santiago's account. Santiago's co-worker, Bradley Kanoa, confirms that he was driving Santiago's company truck on May 1, 2015, recalls seeing a red police car, and heard Santiago "grumbling about a police

officer." Kanoa, however, did not see any car swerve at them or drive them off the road. Decl. of Bradley Kanoa ¶¶ 4, 8–9, 10–16, Dkt. No. 85-17. According to Veincent, he was never on State Highway 11, Volcano Road, around 11:00 a.m. on May 1, 2015. Veincent Decl. ¶ 20. On May 1, 2015, Veincent was assigned to Beat 838 from 6:45 a.m. to 3:30 p.m. and reported to several incidents in Pāhoa, which the County describes as not near the area described by Santiago—a County Police Department Watch Sheet, a Miscellaneous General Report, and a Miscellaneous Service Report document that Veincent was not in the area described by Santiago during his beat. Veincent Decl. ¶¶ 20–22;[5] Defs.' Exs. Q, R, and S (5/1/15 County Police Dep't Reports).

Santiago claims that the County's rebuttal documentation does not demonstrate that Veincent was not in the area around 11:00 a.m., when Santiago claims the incident occurred. The County Police Department Watch Sheet and Work Schedule places Officer Veincent on lunch from 10:00 a.m. to 10:45 a.m. and, according to Santiago, "Veincent lives in the Keaau-Volcano District, exactly where plaintiff states the incident occurred." Am. Mem. in Opp'n at 9. Moreover, under Santiago's theory, because the County's Miscellaneous Service Report does not place Veincent at the scene of an unrelated incident in Pāhoa until 11:35 a.m.,

---

[5]According to Veincent, Beat 838 encompasses the Kalapana area, nearly all of the area south of Kamaili Road in Puna, Hawai'i. Veincent Decl. ¶ 20.

Santiago argues that Veincent had "ample time to drive to his dispatched location." Am. Mem. in Opp'n at 9.

## II.   **Procedural Background**

Santiago filed complaints against the individual Officers with the County Police Commission and the Police Department's Office of Professional Standards ("OPS") following his November 1, 2014 arrest.   *See* Pl.'s Ex. 11 (1/12/15 County Police Commission Compl. against Veincent), Dkt. No. 103-11; Ex. 7 (5/26/15 County Police Commission Compl. against Miyose), Dkt. No. 103-7; Ex. 8 (12/12/16 County Police Dep't OPS Compl. against Miyose), Dkt. No. 103-8.   In October 2016, Santiago, proceeding pro se, filed a civil action against Defendants in the Circuit Court of the Third Circuit, State of Hawai'i, which Defendants removed to this Court on October 28, 2016.   *See* Notice of Removal, Dkt. No. 1; Compl., Dkt. No. 1-1.

### A.   **Santiago's Claims**

Santiago alleges that the individual Officers used "extreme and excessive force" when arresting him on November 1, 2014.   Compl. ¶ 11.   Specifically, he asserts that Veincent "informed [Santiago] he was under arrest after use of extreme, excess force and physical injury to [Santiago]."   Compl. ¶ 12.   Additionally, "[w]hen [Santiago] proceeded to ask Officer Veincent why he was being arrested, his response was, '. . . thought you . . . was going to head-butt the other officer' and

proceeded to force Plaintiff back to the ground, cracking Plaintiff's jaw in the process." Compl. ¶ 12. Miyose, he alleges, "witnessed the entire assault and injury, but failed to protect Plaintiff against Officer Veincent's actions and extreme, excessive abuse that assisted in Plaintiff's extensive injuries." Compl. ¶ 13.

Based upon both the November 1, 2014 and May 1, 2015 incidents, Santiago claims that "Veincent has continually harassed Plaintiff causing him extreme emotional distress. Plaintiff is in fear for his life." Compl. ¶ 16. He alleges that all Defendants "were negligent in [their] failure to provide for Plaintiff's safety and to protect Plaintiff from attack and injury," and "were also negligent in failure to attend or render aid to Plaintiff after he was injured." Compl. ¶ 19. Santiago seeks compensatory and punitive damages for his injuries. Compl. ¶¶ 21–22.

**B.** **Defendants' Motion**

Defendants move for summary judgment on all claims. Dkt. No. 84. The individual Officers, Veincent and Miyose, seek a declaration of qualified immunity on Santiago's claims that they violated his federal constitutional rights under 42 U.S.C. § 1983. The County seeks summary judgment on any theory of municipal liability under Section 1983. On Santiago's state law claims, Defendants assert the state qualified or conditional privilege with respect to any tortious actions taken in the performance of a government official's public duty.

In light of his pro se status, on September 25, 2017, the Court granted

Santiago leave to file an Amended Memorandum and a Separate and Concise

Statement of Facts in Opposition to the Motion ("CSOF").   *See* Dkt. No. 100.

Santiago filed these documents on October 3, 2017 (Dkt. Nos. 102 and 103), and

Defendants filed their supplemental reply on October 10, 2017 (Dkt. No. 104).

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), a party is entitled to

summary judgment "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."   At

summary judgment, a court's function is not to weigh the evidence and determine

the truth but to determine whether there is a genuine issue for trial.   *See Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).   The Court must draw all reasonable

inferences in favor of the nonmoving party, and it may not make credibility

determinations or weigh the evidence.   *See id.* at 255.   A fact is "material" if its

proof or disproof is essential to an element of a plaintiff's case.   *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322–23 (1986).   A factual dispute is "genuine" "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving

party."   *Id.* at 248.   "Where the record taken as a whole could not lead a rational

trier of fact to find for the non-moving party, there is no genuine issue for trial."

*Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted).

Because Santiago is proceeding pro se, the Court liberally construes his filings. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Eldridge v. Block*, 832 F.2d 1132, 1137 (9th Cir. 1987) ("The Supreme Court has instructed the federal courts to liberally construe the 'inartful pleading' of pro se litigants.") (citing *Boag v. MacDougall*, 454 U.S. 364, 365 (1982) (per curiam)).

## DISCUSSION

The Court acknowledges that the events of November 1, 2014 are materially in dispute with respect to certain key facts. However, even adopting the version of the facts advanced by Santiago, the Officers' conduct was reasonable under the totality of the circumstances and they are entitled to qualified immunity on his Section 1983 claims with one exception—the Court denies Officer Veincent qualified immunity on Santiago's excessive force claim. Santiago fails to raise any genuine issue of material fact with respect to any theory of municipal liability, entitling the County to summary judgment. Finally, as to any state law claims—whether sounding in negligence or otherwise—Santiago fails to raise a genuine issue of material fact with respect to Defendants' entitlement to a qualified privilege under state law. The Motion is therefore denied as to Officer Veincent's

qualified immunity request and granted as to all other claims and parties, as further

explained below.

## I.      The Motion Is Granted In Part And Denied In Part As To Santiago's Section 1983 Claims Against The Individual Officers

Santiago contends that the arresting officers used extreme and excessive force

to affect his arrest on November 1, 2014, causing him physical and psychological

injuries.   To successfully assert a Section 1983 claim, a plaintiff must demonstrate

that the action (1) occurred "under color of state law," and (2) resulted in the

deprivation of a constitutional or federal statutory right.[6]   The parties do not dispute

that the Officers acted under color of state law, but disagree as to whether any

Officer used excessive force or is otherwise entitled to qualified immunity on

Santiago's Fourth Amendment claim.[7]   As explained below, the Court grants the

---

[6]Under 42 U.S.C. § 1983,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

[7]Santiago also attempts to allege excessive force claims under the Fourteenth Amendment's substantive due process and/or equal protection prongs.   *See* Am. Mem. in Opp'n at 10–11, 13–14.   "In addressing an excessive force claim brought under § 1983, the analysis begins by identifying the specific constitutional right allegedly infringed [upon] by the challenged application of force."   *Graham v. Connor*, 490 U.S. 386, 394 (1989) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).   The validity of the claim must then be determined by reference to the constitutional standard which governs the right, rather than to a more generalized excessive force standard.   *Id.*; *compare Tennessee v. Garner*, 471 U.S. 1 (1985) (applying the Fourth Amendment standard to a claim of excessive force to effect an arrest), *with Whitley v. Albers*, 475

Motion as to all Section 1983 claims, with the exception of Santiago's excessive force claim against Officer Veincent.

## A.  Fourth Amendment Excessive Force Principles

The Fourth Amendment requires law enforcement officers making an arrest to use only an amount of force that is objectively reasonable in light of the circumstances facing them.  *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985).  To determine the objective reasonableness of a particular use of force, courts engage in a three-step inquiry.  *Glenn v. Washington Cty.*, 673 F.3d 864, 871 (9th Cir. 2011); *see Graham v. Connor*, 490 U.S. 386, 396 (1989).  First, the court "must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted.'"  *Espinosa v. City & Cty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (quoting *Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir. 2003)).  "[E]ven where some force is justified, the amount actually used may be excessive."  *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002).  Second,

---

U.S. 312 (1986) (applying the Eighth Amendment standard to a claim of excessive force to subdue a convicted prisoner), *with White v. Roper*, 901 F.2d 1501, 1507 (9th Cir. 1990) (applying the Fourteenth Amendment's Substantive Due Process standard to a claim of excessive force against a pretrial detainee).  The custodial status of the victim determines the applicable constitutional amendment for excessive force claims.  *See Graham*, 490 U.S. at 393–94.  In light of Santiago's claim that Veincent used excessive force during the course of his arrest and the lack of facts supporting an independent Fourteenth Amendment violation, the Court proceeds under the Fourth Amendment only.  *See Graham*, 490 U.S. at 395 (holding that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach").

the court must evaluate the government's interest in the use of force. *Glenn*, 673 F.3d at 871 (citing *Graham*, 490 U.S. at 396). Finally, a court must "balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Miller*, 340 F.3d at 964.

Fourth Amendment excessive force claims are evaluated under a "reasonableness" standard in which "officers may only use such force as is 'objectively reasonable' under the circumstances." *See Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)); *see also Brosseau v. Haugen*, 543 U.S. 194, 197 (2004). The authority to arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S at 396. Police officers "are not required to use the least intrusive degree of force possible," but must act within a reasonable range of conduct. *Marquez v. City of Phoenix*, 693 F.3d 1167, 1174 (9th Cir. 2012) (quotation marks omitted). The existence of an injury does not necessarily mean that a plaintiff's constitutional rights have been violated or that police officers used excessive force in arresting the plaintiff. Instead, for Fourth Amendment purposes, "[t]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances *confronting them*." *Graham*, 490 U.S. at 397 (emphasis added).

Determining whether a police officer's use of force was reasonable or excessive "requires careful attention to the facts and circumstances of each particular case" and a "'careful' balancing of an individual's liberty with the government's interest in the application of force." *Santos*, 287 F.3d at 854 (quoting *Graham*, 490 U.S. at 396). When evaluating the governmental interest in the use of force at the second step, courts examine three main factors: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010).[8] The "most important" of these factors is whether the suspect posed an "immediate threat to the safety of the officers or others." *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005).

## B. Qualified Immunity Framework

Qualified immunity is an affirmative defense that "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009). The doctrine "protects government officials 'from liability for civil damages insofar as

---

[8]These three factors are not exclusive. Courts may also examine the "totality of the circumstances" and "whatever specific factors may be appropriate in a particular case." *Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010) (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)).

their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id*. at 231 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*.

To determine whether officers are entitled to qualified immunity, courts employ a two-step analysis. "The threshold inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation." *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). If the alleged conduct would not be considered violative, the inquiry is at an end and the defense of qualified immunity applies. *See id*.[9]

"Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 231. To be a clearly established constitutional

---

[9]Under this first step, the Court does not resolve factual disputes in the record. "In fact, the Supreme Court has clarified that the first step of the *Saucier* inquiry in no way requires courts to assume a fact-finding capacity; rather, a court generally just adopts the version of the facts set forth by the party challenging immunity." *Mueller v. Auker*, 576 F.3d 979, 1006 (9th Cir. 2009) (Wallace, J., concurring in part, dissenting in part) (citing *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007) (holding that the dispositive question in the first step of *Saucier*—whether those facts establish a constitutional violation—"is a pure question of law")).

right, a right must be sufficiently clear "that every reasonable official would [have understood] that what he is doing violates that right." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (citation and quotation marks omitted). "[T]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202; *see also Walker v. Gomez*, 370 F.3d 969, 978 (9th Cir. 2004). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id*. at 201. The Supreme Court has repeatedly—and recently—"reiterate[d] the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 137 S. Ct. 548 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Rather, "clearly established law must be particularized to the facts of the case." *Id*. (internal quotation marks and citation omitted). Because the answer to the second question may be dispositive, a court may address it first. *See Pearson*, 555 U.S. at 242.

Adopting the version of the facts advanced by Santiago, the party challenging immunity, the Court turns to the application of the qualified immunity framework in the context of Santiago's Fourth Amendment excessive force claim.

### C.    **Officer Veincent Is Not Entitled To Qualified Immunity**

As detailed below, the Court concludes that Officer Veincent has not met his burden of establishing that he is entitled to qualified immunity on Santiago's excessive force claim under the totality of the circumstances.   While there is certainly some evidence that strongly suggests the appropriate level of force was used by all officers concerned, there are disputes of fact that cannot be resolved through the assessment and weighing of credibility on summary judgment. Accordingly, the Court denies Officer Veincent's request for qualified immunity on Santiago's excessive force claim at this time.

### 1.    **Nature And Quality Of The Intrusion**

The Court begins its examination of the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of force used. *Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir. 2003).   Santiago avers that Veincent "grabbed [him] by the wrist[,] whacked [him] on [the] arm and slammed [him] to the ground with such excessive force that [his] two front teeth were knocked-out from the roots."   Am. Mem. in Opp'n at 6–7 (citing 6/20/17 Santiago Dep. Tr. at 26–27, 31–35).   Santiago recalls that he "was [then] handcuffed, brought to his feet and [he] began to yell at Officer Veincent in his face because he wanted to know why [he] was under arrest and why he was being assaulted."   Am. Mem. in Opp'n at 7.   When Santiago "got into Veincent's face," about one foot

away, "Veincent grabbed [Santiago's] wrist and threw him to the ground again, stepping on plaintiff's back to make sure he stayed down—plaintiff went unconscious and sustained injuries to his elbows, wrist, knee and thigh." Am. Mem. in Opp'n at 6 (citing 6/20/17 Santiago Dep. Tr. at 39–41; Exs. 3–5).

Grabbing a suspect's arm or wrist and twisting and pulling to effectuate an arrest does not typically involve a level of force found to be unreasonable. Indeed, courts have generally referred to such force as "relatively minimal" and "minor." *Donovan v. Phillips*, 685 F. App'x 611, 612–13 (9th Cir. 2017) (officer's use of "control hold" when plaintiff exited car by "gripp[ing] her wrist, and pull[ing] her arm downward, causing Donovan to roll onto the ground" was "relatively minimal" force); *James v. Oakland Police Dep't*, 2016 WL 3230704, at *7 (N.D. Cal. June 13, 2016) ("to take the struggling James to the ground and hold him while handcuffing him, and holding him on the ground until the ambulance arrived, were minor uses of force, most certainly not out of line with the resistance he offered"); *see also Zivojinovich v. Barner*, 525 F.3d 1059, 1072 (11th Cir. 2008) ("pull[ing] [plaintiff's] arm up at an uncomfortable angle while escorting him out" and "using an uncomfortable hold to escort an uncooperative and potentially belligerent suspect is not unreasonable"); *Jackson v. D.C.*, 83 F. Supp. 3d 158, 170 (D.D.C. 2015) (holding that "the nature and degree of the 'physical coercion' the officers used to restrain Plaintiff was 'not markedly different from what we would expect in the

course of a routine arrest . . . [i]ndeed, the action of pulling a person out of his or her car, bending the person's arm behind his or her back, and applying pressure, as Plaintiff alleges the officers here did, is regularly found not to be excessive force for effectuating an arrest").

But the surrounding circumstances and quantum of force employed often vary significantly and can be determinative. *See, e.g., Rodriguez v. Farrell*, 280 F.3d 1341, 1352 (11th Cir. 2002) ("Painful handcuffing, *without more*, is not excessive force in cases *where the resulting injuries are minimal*.") (emphasis added); *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994) (finding physical pressure administered on limbs in increasing degrees, resulting in pain, to be a less significant use of force than physical blows).[10]

### 2. Governmental Interest In The Use of Force

The next step in the *Graham* analysis is to evaluate the government's interests by assessing (a) the severity of the crime; (b) whether the suspect posed an immediate threat to the officers' or public's safety; and (c) whether the suspect was resisting arrest or attempting to escape. *Graham*, 490 U.S. at 396.

------

[10]To be clear, Santiago does not allege—nor do the facts support any inference—that the handcuffs were too tight or that he sustained injuries, such as bruising to his wrists, as a result of being handcuffed. *Cf. LaLonde v. Cty. of Riverside*, 204 F.3d 947, 960 (9th Cir. 2000) (Even "tight handcuffing can constitute excessive force.") (citing *Palmer v. Sanderson*, 9 F.3d 1433 (9th Cir. 1993), and *Hansen v. Black*, 885 F.2d 642 (9th Cir. 1989)).

The Officers were responding at 4:15 a.m. to a 911 call classified as "Active–Domestic," *see* O'Brien Decl. ¶ 4. When Kaili-Leong first arrived, he saw Leong's broken mailbox, displaced rock wall and uprooted tree, and Santiago's damaged truck. He also saw Santiago looking into the windows of Leong's darkened residence. As Santiago approached him, Kaili-Leong smelled a strong odor of alcohol. Kaili-Leong Decl. ¶¶ 9–12.[11]

Santiago was charged with, among other crimes, Operating a Vehicle Under the Influence of an Intoxicant and Attempted Assault in the Third Degree against Officer Wyatt Kaili-Leong; he pled guilty to Criminal Trespass. Defs.' Ex. M (12/5/14 Crim. Compl. in 3DCW-14-003356); Ex. N (8/13/15 Judgement in 3DCW-14-003356). These crimes generally constitute misdemeanor offenses, and although the Court acknowledges "that driving under the influence of alcohol is certainly a serious offense[,] there is no indication from the facts [viewed in the light

_____

[11]The County cites a number of cases for the general proposition that "domestic violence" calls can quickly escalate and place officers in harm's way. *See* Mem. in Supp. 16–17. However, although 911 dispatch categorized Leong's call as "Active–Domestic," there is no evidence of violence or abuse in Leong's relationship with Santiago. Additionally, even domestic violence may not be a severe crime for the purpose of the *Graham* analysis. *See Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (holding that the severity of the crime provided little basis for the officers' use of force where the victim-wife called 911 to report that her husband "was hitting her and/or was physical with her" because the plaintiff-husband was separate from his wife and had no access to weapons); *Kaur v. City of Lodi*, 2017 WL 2833403, at *11 (E.D. Cal. June 30, 2017) ("While the Ninth Circuit has emphasized the increased danger officers face when responding to domestic disturbances, Ninth Circuit precedent has distinguished cases where (i) the domestic dispute terminated before officers arrived and (ii) the alleged abuser is no longer in the presence of or close proximity to the victim.").

most favorable to Santiago] that [he] was actually engaged in *that* offense" at the time he was arrested. *Koiro v. Las Vegas Metro. Police Dep't*, 69 F. Supp. 3d 1061, 1069 (D. Nev. 2014), *aff'd*, 671 F. App'x 671 (9th Cir. 2016) (emphasis added).

Turning to the most important factor, the evidence, when construed in the light most favorable to Santiago, does not clearly support a finding that he "posed an immediate threat to the safety of the officers or others." *Graham*, 490 U.S. at 396. Throughout the course of events, Santiago was never in the presence of Leong. She did not exit the residence nor did he enter. Santiago was therefore not in a proximate position to cause her harm, even if he wanted to, and certainly not after the officers arrived. Further, in Santiago's retelling, after climbing back over the rock wall into the area near the roadway, he began calmly conversing with Kaili-Leong. Santiago then described the moments that ensued once Veincent arrived on-scene:

> Q. So how long did it take between the car—[Officer Veincent's] car stopping and you being on the ground?
>
> A. Thirty seconds.
>
> Q. And it was unexpected?
>
> A. That's correct.
>
> Q. Okay. You didn't see him come up to you?
>
> A. No. I would have stepped—backed away if I'd seen the aggressiveness, but I didn't see anything. That's what

I'm saying, blindsided, false cracked—I didn't expect that.

Q.    Okay.

A.    I mean why did I deserve—I told him that, I didn't deserve that.

Q.    Okay.   And then you say, I didn't deserve that?

A.    Yeah, first I told him, why you did that for?

Q.    Okay.

A.    And then he said, I thought you was going to head butt the other officer, okay.

Q.    Now, when you said, what you did that for, were you still on the ground?

A.    Yeah.   I was still on the ground.

Q.    Okay.

A.    And he was handcuffing me, taking my money out of my pocket.   I'm under arrest or what?   He said yeah, you're under arrest.   I said, what for?   He never tell me what for.

Q.    You said you were handcuffed?

A.    Yeah.   He probably handcuffed me first.

Q.    Okay, so I didn't deserve this, I thought you were going to head butt the other officer.   Am I under arrest?   Yes, you are, and then you got up?

A.    He got off of me.

Q.    He got off of you?

A.    Yes.

Q.    And then you said you were into his face, what does that
mean?

A.    I went to his face.   I mean I went to his face, I was yelling
at him.

Q.    So some blood got on his face?

A.    I believe so.

Q.    From your mouth?

A.    Yeah.

Q.    So you were pretty close then?

A.    Yes.

Q.    How close were you?

A.    One foot away, maybe.

Q.    One foot, okay.   And what was he doing at that time, was
he just standing there?

A.    Yes.

Q.    He didn't move back and forth or anything?

A.    No, he threw me down on the ground again.   He grabbed
my hand again, he threw me down on the ground again.

Q.    You guys were face-to-face?

A.    Yes.

Q.  You were yelling at him?

A.  Yes.

Q.  He threw you down on the ground?

A.  Yes.

Q.  How did he do that?

A.  He grabbed me by my wrist and threw me down on the ground again.

Q.  He grabbed you by your right wrist?

A.  Yes.

Q.  Behind you?

A.  He just grabbed me and throw me back down on the ground.

Q.  Okay.  So when you said, throw you back—

A.  And then he threw me down on the ground, and then he stepped on my back, and make sure I stay down, I and then I went unconscious.

Q.  You said he grabbed you, where did he grab you?

A.  My right arm.

Q.  With his hands?

A.  Yes.

Q.  Okay.  And then threw you down on the ground on your front?

A. Yes.

Q. Okay. And so—where did you land—like what part of your body landed on the ground?

A. My chest and my head.

Q. Okay. Did you receive any injuries to your chest or your head the second time?

A. Yes, yes.

Q. Where?

A. Well—well the injuries is all together because already my teeth came out already. Maybe the second one knocked the third teeth loose.

Q. How did your tooth come out.

A. It just popped out.

Q. So you hit your chin the first time, and hit your teeth, and your teeth came out?

A. Yes.

6/20/17 Santiago Dep. Tr. at 34–42.

Adopting Santiago's version of events, it is not clear that he did, in fact, present an immediate threat of harm to the Officers. According to Santiago, he was conversing with Kaili-Leong about an old injury that Santiago had suffered the previous week when Veincent "false-cracked" him, or hit from behind, without any provocation. Although Veincent may have subjectively believed that Santiago was

going to head butt Kaili-Leong, which prompted Veincent's sudden action, Santiago

disputes that he was even uncooperative, much less threatening. *See* Veincent

Decl. ¶ 14; *see also* Pl.'s CSOF ¶ 1(admitting Defs.' CSOF ¶¶ 52–56, specifically,

that Veincent told him contemporaneously that he "thought [Plaintiff] was going to

head-butt the other officer"); Dkt. No. 103. When considering whether there was

an immediate threat, "a 'simple statement by an officer that he fears for his safety or

the safety of others is not enough; there must be objective factors to justify such a

concern." *Mattos v. Agarano*, 661 F.3d 433, 441–42 (9th Cir. 2011) (en banc)

(quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001)). Such

objective factors are absent—at least, in Santiago's retelling of events.

When Santiago continued to challenge Veincent after being handcuffed,

yelling and spitting blood in his face, Veincent took Santiago down to the ground a

second time by grabbing his arm and wrists, and holding him down with a foot.

Viewing the circumstances in the light most favorable to Santiago, however, it is not

clear that a reasonable officer would have perceived him to be an immediate threat,

given that Santiago had at that point been handcuffed, did not have any weapons at

his disposal, and Veincent was accompanied by at least two other officers. *See*

*Longoria v. Pinal Cty.*, 873 F.3d 699, 705 (9th Cir. 2017) ("the inquiry is thus

whether he posed an immediate threat to [the officer] or the many officers around

him, or whether a reasonable officer would have perceived [the suspect] to be an immediate threat").[12]

Finally, courts may also consider whether the individual was "actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Courts "draw a distinction between a failure to facilitate an arrest and active resistance to arrest. Moreover, the crux of this *Graham* factor is compliance with the officers' requests, or refusal to comply." *Mattos v. Agarano*, 661 F.3d 433, 450–51 (9th Cir. 2011) (en banc). According to Santiago's rendition, he was not resistant nor did he attempt to flee. He had climbed back over the fence after being requested to do so by Kaili-Leong, and then engaged in a conversation with

---

[12]*See, e.g., Koiro*, 69 F. Supp. 3d at 1070 ("Viewing the facts in the light most favorable to [plaintiff], the Court finds that there was no immediate threat to [the officer's] safety. [Plaintiff] had not made any movements or statements toward [the officer] that would indicate hostility or aggression. In fact, [plaintiff] was walking away from [the officer] at the time of the alleged use of force."); *see also Winterrowd v. Nelson*, 480 F.3d 1181, 1185 (9th Cir. 2007) (finding that verbal objections to being arrested and a "belligerent attitude," where the arrestee claims he was neither threatening nor physically abusive, pose no physical danger and thus cannot justify slamming the arrestee against the hood of a car); *Phelps v. Coy*, 286 F.3d 295, 302 (6th Cir. 2002) (holding that a police officer's tackling of a handcuffed suspect, hitting him in the face twice, and banging his head on the floor three times, was unconstitutional), *cert. denied*, 537 U.S. 1104 (2003). *But cf. Avery v. Davis*, 700 F. App'x 949, 953 (11th Cir. 2017) (no excessive force where officer brought suspect "back to the ground and h[eld] [suspect] down with his knee, [officer's] actions] were justified because [suspect] admits that he was attempting to stand up while being arrested"); *Zivojinovich*, 525 F.3d at 1073 (holding that officer's "use of his taser gun was reasonably proportionate to the need for force," where suspect had broken nose "and he sprayed blood when he spoke," and officer testified that he believed suspect was intentionally spraying blood toward officer through broken nose, but where suspect "testified in his deposition that it was not intentional, [the court] must treat it as though it were [intentional] because the evidence is that is how it would appear to a reasonable officer at the scene") (citations omitted).

Kaili-Leong.   Nothing else had been requested of him when Veincent, according to

Santiago, came out of nowhere and took matters into his own hands.[13]

In addition to the considerations set forth in *Graham*, the Ninth Circuit has

recognized that "although officers are not required to use the least intrusive degree

of force possible, the availability of alternative methods, is a relevant factor in

determining whether the amount of force used in a particular instance was, in fact,

reasonable."   *Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012) (citations

and internal quotation marks omitted).   The Court acknowledges that the facts are

in dispute regarding whether Santiago stumbled or was "slammed" to the ground by

Veincent, dislodging Santiago's teeth.   However, at least from the point in time

when he was already subdued and handcuffed, it appears that Officer Veincent could

reasonably have altered tactics by simply stepping away from Santiago, particularly

with the aid of his fellow officers in the proximate vicinity, which would have

minimized or even eliminated the need for the employment of additional force.

---

[13]*Cf. Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012) (Cases dating to before 2001 established that a passively resistant, nonviolent suspect's "failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force."); *Barnard v. Las Vegas Metro. Police Dep't*, 310 Fed. Appx. 990, 992–93 (9th Cir. 2009) (applying "excessive knee pressure on [arrestee's] . . . back despite the fact that he had surrendered and was not resisting arrest" constitutes excessive force); *Bryan*, 630 F.3d at 829–30 (reasoning that an arrestee's cursing and muttering to himself and exiting his vehicle despite being told to stay in car was not active resistance); *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir. 2003) (holding that "once Drummond was on the ground, he 'was not resisting the officers'; there was therefore little or no need to use any further physical force[, therefore all] three *Graham* factors would have permitted the use of only minimal force once Drummond was handcuffed and lying on the ground").

### 3.    <u>Balancing The Competing Interests</u>

The third step of the excessive force inquiry requires the Court to balance the gravity of the intrusion on Santiago's Fourth Amendment rights against the Defendants' need for that intrusion. Here, the force used was neither trivial nor inconsequential—it was moderate. This level of force resulted in more than a minimal intrusion on Santiago's rights and was not justified by the governmental interest in subduing an allegedly compliant trespasser, who could very well have been dispersed or apprehended by less forceful means. Adopting the factual scenario presented by Santiago, the Court finds that Veincent's use of force under these circumstances does not outweigh the gravity of the intrusion and violated Santiago's rights under the Fourth Amendment.[14] That is, viewing the totality of evidence in the light most favorable to Santiago, Veincent's use of force was a constitutionally excessive.

---

[14] *See, e.g.*, *Young v. Cty. of L.A.*, 655 F.3d 1156, 1165 (9th Cir. 2011) ("When, as here, a suspect's disobedience of a police officer takes the form of passive noncompliance that creates a minimal disturbance and indicates no threat, immediate or otherwise, to the officer or others, it will not, without more, give rise to a governmental interest in the use of significant force."); *Drummond*, 343 F.3d at 1059 (holding constitution was violated where "some force was surely justified in restraining Drummond so that he could not injure either himself or the arresting officers[, h]owever, after he was handcuffed and lying on the ground, the force that the officers then applied was clearly constitutionally excessive when compared to the minimal amount that was warranted"); *Garlick v. Cty. of Kern*, 167 F. Supp. 3d 1117, 1161 (E.D. Cal. 2016) (Denying summary judgment on excessive force claim due to issues of fact, because "taking Plaintiffs' facts as true that officers used impact blows and prolonged body-weight pressure to [decedent's] back after he was restrained, on the ground, and handcuffed, a reasonable jury could infer from the circumstances that [participating officers] were integral participants during the time when one or both of the allegedly violative applications of force occurred.").

**D.**     <u>**Whether Veincent Violated Clearly Established Law**</u>

The Court turns to the second prong of the qualified immunity analysis—whether the right violated was clearly established as of November 1, 2014. Viewing the evidence in the light most favorable to Santiago, the Court finds that the Officers had "fair warning" that the force used "was constitutionally excessive even absent a Ninth Circuit case presenting the [identical] set of facts." *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1061 (9th Cir. 2003). A reasonable police officer could not properly believe that the use of the level of force—as alleged by Santiago—would not violate a clearly established constitutional right. *See Gravelet–Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013) ("The right to be free from the application of non-trivial force for engaging in mere passive resistance was clearly established *prior to 2008*.") (citations omitted); *see also Westfahl v. D.C.*, 75 F. Supp. 3d 365, 374 (D.D.C. 2014) ("Striking a passive arrestee to compel affirmative compliance is a clearly established constitutional violation."); *Millbrooke v. City of Canby*, 2013 WL 6504680, at *10 (D. Or. Dec. 11, 2013) ("A reasonable officer should know that the Fourth Amendment prohibits him from taking a civilian violently to the ground

without provocation[.]").[15]   As such, Veincent was on reasonable notice that his actions violated the Fourth Amendment.

In sum, the Court concludes that Officer Veincent has not met his burden on summary judgment of establishing that his conduct was objectively reasonable under the circumstances and did not violate Santiago's clearly established Fourth Amendment rights.   Defendants' Motion is therefore denied insofar as the Court concludes that Officer Veincent is not entitled to qualified immunity on Santiago's excessive force claim.[16]

### E.   Miyose Is Entitled To Qualified Immunity

In his latest filing, Santiago acknowledges that he "erred in naming Officer Miyose as being the initial officer on the scene," but argues that Miyose is nonetheless subject to liability because "[a]though Officer Miyose did not touch, yell or contact plaintiff in any physical way, Plaintiff's Fourteenth Amendment right

---

[15]The Court acknowledges that Santiago, proceeding pro se, identifies no case to satisfy the standard required by *White v. Pauly*, 137 S. Ct. 548 (2017), that clearly established law be particularized to the facts of this case.   The Court recognizes, however, that "no two cases are exactly alike" and that the Court is not required, particularly under the circumstances presented here, to find a case "directly on point."   *Hughes v. Kisela*, 862 F.3d 775, 786–87 (9th Cir. 2016), *as amended* (June 27, 2017) (internal citations omitted).

[16]To the extent Santiago alleges that the May 1, 2015 incident involving Veincent serves as another basis for his Section 1983 claims, he identifies no constitutional right violated, nor that such a right was clearly established as of that date.   Thus, insofar as Santiago alleges a constitutional violation based upon that episode—which Defendants wholly deny even occurred—Veincent is entitled to qualified immunity, even adopting Santiago's version of events.

was violated when Officer Miyose failed to 'equally protect' Plaintiff from Veincent's infliction of excessive force."   Am. Mem. in Opp'n at 13–14.

Under the Fourth Amendment,[17] "[p]olice officers have a duty to intercede when their fellow officers violate the constitutional right of a suspect or other citizen."   *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000).   "[T]he constitutional right violated by the passive defendant is analytically the same as the right violated by the person who strikes the blows."   *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), *rev'd in part on other grounds*, 518 U.S. 81 (1996). If an officer fails to intervene when fellow officers use excessive force, he or she would be responsible for violating the Fourth Amendment, just as the officer who employed the force would be.   *Id*.   This is so, however, only if the officer had "a realistic opportunity" to intercede.   *Cunningham*, 229 F.3d at 1289.   Miyose had no such opportunity.

_____

[17]Although he alleges a Fourteenth Amendment equal protection violation, in order to prevail on an equal protection claim, plaintiff must demonstrate that a Defendant, acting under color of state law, discriminated against him as a member of "an identifiable class and that the discrimination was intentional."   *Flores v. Morgan Hill Unified Sch. Dist*., 324 F.3d 1130, 1134 (9th Cir. 2003). No evidence has been disclosed from which it may be inferred that any Defendant discriminated against Santiago or that similarly situated persons have been treated disparately.   Pursuant to *Graham*, Plaintiff's claims touching on excessive force during the course of his arrest are properly analyzed under the Fourth, not Fourteenth, Amendment.   *See Gomez v. City of Whittier*, 211 F. App'x 573, 577 (9th Cir. 2006) ("[B]ecause [plaintiffs'] false arrest and excessive force claims fall 'squarely within the scope of the Fourth Amendment,' they must be analyzed according to its principles, and not under the generalized notion of Fourteenth Amendment substantive due process.   Plaintiffs' equal protection claims also fail because they raise no genuine issue of material fact that the officers' actions were motivated by race, or any other impermissible ground.") (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998)).

Indeed, implicit in the rule that officers can be held liable for failing to intervene, is the actual presence of the officer during the assault. *See Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997) ("Generally speaking, a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring."). The facts indicate that, prior to his arrival, Miyose had no contact with Santiago nor did he observe the altercation in which Santiago was injured. The record is undisputed that when Miyose arrived at Leong's home, Santiago was already handcuffed and on the ground. Miyose Decl. ¶ 8. As a result, even when viewed in the light most favorable to Santiago, the facts do not demonstrate that Miyose violated his clearly established constitutional rights.

Santiago fails to present the Court with sufficient evidence to demonstrate that Miyose violated his clearly established constitutional rights. *See Turner*, 119 F.3d at 429 ("[T]he record is devoid of any suggestion that [the defendant] actually observed or should have known of [the violating defendant's] actions."). Accordingly, the Court concludes that even when the facts and all reasonable inferences are viewed in the light most favorable to Santiago, Miyose is entitled to summary judgment.

**F.     Defendants Are Entitled To Summary Judgment On Santiago's Claim That He Was Denied Medical Care**

Santiago alleges that the Officers did not promptly provide him with adequate medical care following his arrest.   Compl. ¶ 14 ("Plaintiff was detained and fell unconscious while in police custody and does not recall having treatment for his injuries."); *id.* ¶ 19.   The objective evidence demonstrates the contrary.   Medics were dispatched at 4:57 a.m. and arrived at the police station shortly thereafter. O'Brien Decl. ¶ 15; Defs.' Ex. L at 3 (Event Chronology for Event No. P2014200502).   Santiago arrived at the Pāhoa Police Station at 5:04 a.m., and although he claims he was denied medical care, the County Incident Reports note that aid was not desired.   O'Brien Decl. ¶ 16; Ex. L at 3; *see also* Pl.'s Ex. 18 (11/1/14 County Fire Dep't Incident Report), Dkt. No. 103-18 (noting "No mutual/automatic aid was given or received" and "UPON ARRIVAL, NO EMS NEEDED OR WANTED").   In any event, although Santiago did not receive any medical treatment while at the police station, it was promptly made available to him, despite his recollection of events.

The Fourth Amendment requires law enforcement officers to provide objectively reasonable post-arrest care to an apprehended suspect.   *Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006).   For example, "a police officer who promptly summons . . . necessary medical assistance has acted

reasonably for purposes of the Fourth Amendment[.]" *Id*. at 1098–99 (the Fourth Amendment is the proper analytical framework in which to evaluate such a claim, following the decision in *Graham*, 490 U.S. 386); *see also City of Revere v. Mass. Gen. Hosp*., 463 U.S. 239, 245 (1983) ("Whatever the standard may be, [the defendant] fulfilled its constitutional obligation by seeing that [the apprehended person] was taken promptly to the hospital that provided the treatment necessary for his injury.").

Here, it is clear that at least one officer called for medical assistance from the scene before Santiago was transported to the police station. It is also undisputed that paramedics arrived within minutes after Officers transported Santiago to the police station for booking. "[T]he critical inquiry is not whether the officers did all that they could have done, but whether they did all that the Fourth Amendment requires." *Tatum*, 441 F.3d at 1099 (holding that a police officer who promptly summons the necessary medical assistance, even if the officer does not in the meantime administer CPR, has acted reasonably for purposes of the Fourth Amendment). Thus, even accepting Santiago's facts as true, the Court concludes that because the Officers promptly summoned medical care to attend to him, whether or not he accepted such treatment at the police station, Defendants met the minimum standard of reasonableness for purposes of the Fourth Amendment. *See*

42

*id*.   Therefore, the individual Officers are entitled to summary judgment on Santiago's Section 1983 claim relating to the denial of medical care.

## II.   <u>The Officers Are Entitled To The State Law Qualified Privilege</u>

Under Hawai'i law, non-judicial government officials have a qualified or conditional privilege with respect to allegedly tortious actions taken in the performance of their public duties.   *Towse v. State of Hawaii*, 64 Haw. 624, 631, 647 P.2d 696, 702 (1982)); *see also Medeiros v. Kondo*, 55 Haw. 499, 504, 522 P.2d 1269, 1272 (1974).   There is no dispute that Defendants' allegedly tortious conduct here occurred while the Officers were performing their public duties as police officers.

Such government officials, however, are not entitled to the privilege when a plaintiff "demonstrate[s] by clear and convincing proof that those officials were stirred by malice and not by an otherwise proper purpose."   *Towse*, 64 Haw. at 631, 647 P.2d at 702.   Malice is defined as "the intent, without justification or excuse, to commit a wrongful act, reckless disregard of the law or of a person's legal rights, and ill will; wickedness of heart."   *Awakuni v. Awana*, 115 Hawai'i 126, 141, 165 P.3d 1027, 1042 (2007) (quoting Black's Law Dictionary 976 (8th ed. 2004)) (internal quotation marks omitted).   Because malice involves intent, reckless disregard, or ill will, some courts in this district have determined that the malice requirement is "incompatible with a claim based on negligence."   *Bartolome v.*

*Kashimoto*, 2009 WL 1956278, at *2 (D. Haw. 2009); *but see Morgan v. Cty. of Hawaii*, 2016 WL 1254222, at *22 (D. Haw. Mar. 29, 2016) ("Hawaii law only requires a claimant to overcome an official's qualified immunity by proving the official's malice, including with respect to allegedly negligent conduct.").

In any event, because Santiago points to nothing in the record that raises a genuine issue of fact as to whether the Officers were motivated by "malice," rather than by a desire to protect other Officers and discharge their duties, the Officers are entitled to the qualified or conditional privilege under state law. That is, with respect to Santiago's tort claims—whether styled as assault and battery, intentional infliction of emotional distress, or harassment—the individual Officers, Veincent and Miyose, are entitled to summary judgment. *See Edenfield v. The Estate of Willets*, 2006 WL 1041724, at *12 (D. Haw. April 14, 2006) ("For a tort action to lie against a nonjudicial government official, the injured party must allege and demonstrate by clear and convincing proof that the official was motivated by malice and not by an otherwise proper purpose. When a public official is motivated by malice, and not by an otherwise proper purpose, Hawaii law provides that the cloak of immunity is lost and the official must defend the suit the same as any other defendant.") (citations omitted, emphasis added).

Santiago falls far short of raising any issue of fact "demonstrat[ing] by *clear and convincing proof* that [any] official was motivated by malice and not by an

otherwise proper purpose." *Freeland v. Cty. of Maui*, 2013 WL 6528831, at *18

(D. Haw. Dec. 11, 2013) (quoting *Edenfield v. Estate of Willets*, 2006 WL 1041724

at *11–*12 (D. Haw. 2006)) (emphasis added). Rather, Santiago offers nothing

more than the legal conclusion that Defendants acted with malice, and thus raises no

genuine issue for trial. *See* Am. Mem. in Opp'n at 3; *Haldeman v. Golden*, 2008

WL 1744804, at *13 (D. Haw. Apr. 16, 2008) ("[T]he issue of malice is appropriate

for determination by the court if the evidence surrounding a claim for malice is

uncontroverted.").

Because there is no evidence of malice, the individual Officers are entitled to

the qualified privilege under state law, mandating summary judgment on these

claims.[18]

## III.    The County Is Entitled To Summary Judgment On All Claims

Santiago alleges that the County is liable under Section 1983 because "the

alleged constitutional violations were caused by a failure to train municipal

employees adequately," and because a "final policy maker in this case, the Mayor,

Chief of Police, Police Commission, OPS (collectively 'County') adopted and

---

[18]Because the individual Officers are entitled to the qualified/conditional privilege, *respondeat superior* liability is likewise foreclosed against the County as to these claims. *See Freeland v. Cty. of Maui*, 2013 WL 6528831, at *25 (D. Haw. Dec. 11, 2013) ("Under the theory of *respondeat superior*, an employer may be liable for the negligent acts of its employees that occur within the scope of their employment.") (citation omitted); *see also Silva v. City & Cty. of Honolulu*, 2013 WL 2420902 at *20 (D. Haw. May 31, 2013); *Reed v. City & Cty. of. of Honolulu*, 76 Hawai'i 219, 227, 873 P.2d 98 (1994).

expressly approved the acts of others who caused the constitutional violation."

Am. Mem. in Opp'n at 15 (citations and some internal quotation marks omitted).

To the extent Santiago alleges Section 1983 municipal liability claims against the

County, he fails to raise a genuine issue of material fact with respect to any custom

or policy, failure to train, or ratification theory of liability.   As detailed below, the

County is entitled to summary judgment on all causes of action.

### A.   Municipal Liability Under Section 1983

Santiago may establish municipal liability under Section 1983, as recognized

in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), by showing at least

one of the following:

> (1) conduct pursuant to an official policy inflicted the injury;
> (2) the constitutional tort was the result of a "longstanding
> practice or custom which constitutes the standard operating
> procedure of the local government entity;" (3) the tortfeasor was
> an official whose acts fairly represent official policy such that
> the challenged action constituted official policy; or (4) an
> official with final policy-making authority "delegated that
> authority to, or ratified the decision of, a subordinate."

*Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008).   In other words, municipal liability

under Section1983 may be premised on an officially promulgated policy, a custom

or persistent practice, deliberately indifferent training that is the proximate cause of

the violation of the plaintiff's federally protected rights, or a single decision by an

official with final decision-making authority.   *See City of Canton v. Harris*, 489

U.S. 378 (1989); *St. Louis v. Praprotnik*, 485 U.S. 112 (1988); *Pembaur v. Cincinnati*, 475 U.S. 469 (1986).

### B. The County's Use Of Force Policy Was Not Unconstitutionally Applied To Santiago Under The Circumstances Alleged

Santiago asserts, without further elaboration, that the "County's 'Use of Force' procedures and execution are flawed and its customary policy caused the infliction of Plaintiff's extensive injuries." Am. Mem. in Opp'n at 15. A *Monell* claim premised on an allegedly unconstitutional municipal policy requires the plaintiff to establish:

> (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy [was] the moving force behind the constitutional violation.

*Berry v. Baca*, 379 F.3d 764, 767 (9th Cir. 2004) (citations and quotation marks omitted). *See also Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."). Santiago falls far short of demonstrating these requirements.

Santiago does not point to any *unconstitutional* formal policy that the County expressly adopted and implemented, in the face of the County's evidence that

excessive force complaints are investigated by the Police Commission and/or OPS, and that OPS investigations are forwarded to an Administrative Review Board to determine whether there is a sufficient basis to sustain the findings.  *See* Defs.' Ex. I (County Use of Force Policy, Eff. 4/12/12), Dkt. No. 85-10; Decl. of Police Chief Paul K. Ferreira ¶¶ 5–7, Dkt. No. 85-9.

Moreover, Santiago does not explain how the Officers' execution of the County's Use of Force Policy caused his injury here, which is fatal to this aspect of his *Monell* claim.   A local government may be held liable "when implementation of its official policies or established customs *inflicts* the constitutional injury." *Monell*, 436 U.S. at 708.   For the County to be liable under Section 1983, Santiago must establish that a County policy, custom, or practice was the "moving force" behind the alleged violation of his Fourth Amendment rights.   *Monell*, 436 U.S. at 694 (1978).   Santiago not only fails to do so, but fails to offer so much as a theory of how that could be the case.

C.     **The County Is Entitled To Summary Judgment On Santiago's Ratification Theory of Municipal Liability**

Santiago's ratification theory of Section 1983 liability fares no better.   A municipality may be liable under *Monell* for the unconstitutional conduct of its employees when a municipal official with final policymaking authority knows of the constitutional violation and approves it.   *See Praprotnik*, 485 U.S. at 127.   "If the

authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Praprotnik*, 485 U.S. at 127. Put another way, Santiago "must show the decision was the product of a conscious, affirmative choice to ratify the conduct in question. Such a ratification 'could be tantamount to the announcement or confirmation of a policy for purposes of *Monell*.'" *Edenfield*, 2006 WL 1041724, at \*16 (D. Haw. Apr. 14, 2006) (quoting *Haugen v. Brosseau*, 339 F.3d 857, 875 (9th Cir. 2003), *reversed on other grounds by Brosseau v. Haugen*, 543 U.S. 194 (2004) (per curiam)). *See also Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) (ratification requires proof of a policymaker's knowledge of the alleged constitutional violation); *Trevino*, 99 F.3d 911, 920 (9th Cir. 1996) (ratification requires an adoption and express approval of the acts of others who caused the constitutional violation); *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992) (an official policymaker must "make a deliberate choice from among various alternatives to follow a particular course of action").

Santiago's ratification theory is deficient for several reasons. First, there is no evidence that any County official deliberately chose to "endorse" any individual Officer's conduct and the basis for it, which must occur "before the policymaker will be deemed to have ratified the subordinate's discretionary decision." *Gillette*, 979 F.2d at 1348. A mere failure "to overrule the unconstitutional discretionary acts of

subordinates[,]" without expressly endorsing or approving of the conduct, is an insufficient predicate for the imposition of liability against the municipality. *Id*. There must exist "something more" than Santiago's naked allegations "that a policymaker concluded that the defendant officer's actions were in keeping with the applicable policies and procedures." *Garcia v. City of Imperial*, 2010 WL 3911457, at *2 (S.D. Cal. 2010) (citing *Kanae v. Hodson*, 294 F. Supp. 2d 1179, 1191 (D. Haw. 2003) and *Larez v. City of Los Angeles*, 946 F.2d 630, 646–48 (9th Cir. 1991)).

Second, equally absent is any evidence that any challenged action was taken or ratified by an official with "final policymaking authority." *See Pembauer v. Cincinnati*, 475 U.S. 469, 482–83 (1986). It is not clear to the Court, for instance, how any policymaker, *i.e.*, the Mayor or Chief of Police, "ratified" any Officer's conduct in this particular matter.[19] In any event, it is enough that Santiago fails to set forth evidence that the Mayor or the Police Chief approved of an *unconstitutional* act that caused an injury to Santiago, as discussed previously.

-----

[19]Instead, the Chief declares that in all excessive force investigations conducted by OPS in "which the ARB sustained the charges and recommended discipline[,] . . . [he] imposed discipline." Ferreira Decl. ¶ 7.

**D.    The County Is Entitled To Summary Judgment On Any Failure To Train And/Or Supervise Theory**

A municipality may be liable for its failure to train only when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."   *City of Canton*, 489 U.S. at 390.   Santiago argues in a wholly conclusory fashion, and without any evidentiary support, that the County "acted with deliberate indifference" and that "the alleged constitutional violations were caused by a failure to train municipal employees adequately."   Am. Mem. in Opp'n at 15.   He points to no record evidence of a policy or history of training deficiencies.[20]

Santiago's conclusory allegations fall far short of evidencing any "informal policy" or "widespread practice" sufficient to survive the instant Motion.   *See Hunter v. Cty. of Sacramento*, 652 F.3d 1225, 1234 (9th Cir. 2011).   Mere allegations, at this stage of the proceedings, are not enough.   Evidence is required, and Santiago offers none.   Liability may only be imposed for failure to train when that failure "reflects a 'deliberate' or 'conscious' choice by a municipality."   *City of*

---

[20]Indeed, to the contrary, the County submits the Declaration of the Chief of Police averring that every officer is required to undergo and complete a training program that includes the reasonable use of force.   Ferreira Decl. ¶¶ 3–5.   In addition to this training, each officer receives annual in-service training on these subjects and must comply with the Department's policies regarding arrest and the use of force.   *Id.*

*Canton*, 489 U.S. at 389. Further, failure to train claims "can only yield liability against a municipality where that city's failure to train reflects deliberate indifference to the constitutional rights of its inhabitants." *Id*. at 392. Given these restrictions, a plaintiff seeking to impose municipal liability for failure to train must show: "(1) [A]n inadequate training program, (2) deliberate indifference on the part of the [municipality] in adequately training its law enforcement officers, and (3) [that] the inadequate training 'actually caused' a deprivation of [a plaintiff's] constitutional rights." *Merritt v. Cty. of L.A.*, 875 F.2d 765, 770 (9th Cir. 1989); *see also Gibson v. County of Washoe*, 290 F.3d 1175, 1194 (9th Cir. 2002) (setting forth a similar three-prong test) (citation omitted); *Wereb v. Maui Cty.*, 727 F. Supp. 2d 898, 921 (D. Haw. 2010).

The County submits evidence of a written policy that requires officers to undergo training to use only the force reasonably necessary to accomplish lawful objectives and prohibits excessive force. Defs.' Ex. I (County Use of Force Policy, Eff. 4/12/12); Ferreira Decl. ¶¶ 3–5. While Santiago conclusorily asserts that Officers violated County policy, he fails to show that the alleged violation was the product of an official County policy or County custom of ignoring the written policy or a failure to adequately train officers regarding the policy. In fact, no evidence suggests any custom or practice of either flouting the written policy or failing to train or supervise Officers—to the contrary, the Officers each state that they received

training and followed the relevant policy.  *See* Kaili-Leong Decl. ¶¶ 3–5, 24;

Veincent Decl. ¶¶ 3–5, 19; Arnold Decl. ¶¶ 3–5, 14; Miyose Decl. ¶¶ 3–5, 11.

On summary judgment, Santiago fails to raise a genuine issue that "the need

for more or different training is so obvious, and the inadequacy so likely to result in

the violation of constitutional rights, that the policymakers of the city can reasonably

be said to have been deliberately indifferent to the need."  *Canton*, 489 U.S. at 390;

*see also Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 407–09 (1997) (explaining

that deliberate indifference may be shown through a "pattern of tortious conduct by

inadequately trained employees" or where "a violation of federal rights may be a

highly predictable consequence of a failure to equip law enforcement officers with

specific tools to handle recurring situations").

### E.    The County Is Entitled To Summary Judgment On State Law Negligent Training And/Or Supervision Claims

To the extent Santiago's Complaint can be read to also assert a cause of action

against the County for negligent supervision and/or training under Hawaiʻi law, such

a claim "may only be found where an employee is acting outside of the scope of his

or her employment[.]"  *Dairy Rd. Partners v. Island Ins. Co., Ltd.*, 92 Hawaiʻi 398,

427, 992 P.2d 93 (2000); *see also Wong–Leong v. Hawaiian Indep. Refinery, Inc.*,

76 Hawaiʻi 433, 444–45, 879 P.2d 538 (1994) (adopting the test for negligent

supervision set forth in the Restatement (Second) of Torts § 317, requiring that the

employee be acting outside the scope of his employment). Santiago presents no evidence that any Officer was acting outside the scope of his employment at the time of the described events. Indeed, he alleges that they were acting *within* the scope of their employment and under color of law when they arrested him on November 1, 2014. *See* Am. Mem. in Opp'n at 4.

Nor is there any evidence that Kaili-Wong, Veincent, Arnold, Miyose, or any other officer required a greater degree of control or supervision, and that the County was aware of it. *See Otani v. City & Cty. of Haw.*, 126 F. Supp. 2d 1299, 1308 (D. Haw. 1998) ("Under Hawaii law, before a plaintiff can establish a claim for negligent training and/or supervision, the plaintiff must establish that the employer knew or should have known of the necessity and opportunity for exercising such control. If an employer has not been put on notice of the necessity for exercising a greater degree of control or supervision over a particular employee, the employer cannot be held liable as a matter of law.") (citing *Abraham v. S.E. Onorato Garages*, 50 Haw. 628, 639, 446 P.2d 821, 826 (1968)). Santiago's pleadings fail to identify a specific training program, a deficiency in the program, or any facts describing how the deficiency is related to the injuries alleged. Nor does he set forth facts identifying how the County failed in its supervisory responsibilities. Accordingly, the County is entitled to summary judgment on any state law claims for negligent training and/or supervision.

### F.    Summary Of Claims Against The County

Even construing the evidence and all inferences in the light most favorable to the non-moving party, Santiago fails to demonstrate that there is any genuine issue for trial on his Section 1983 municipal liability or state law claims as to the County. Accordingly, the County is entitled to summary judgment on all claims.

### CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment on All Claims is GRANTED with respect to all claims against all Defendants, other than Santiago's Section 1983 excessive force claim as to Officer Veincent.   That cause of action remains for trial.

IT IS SO ORDERED.

DATED: December 20, 2017 at Honolulu, Hawai'i.



Derrick K. Watson
United States District Judge

*Santiago v. Cty. of Haw. et al.*; CV 16-00583 DKW-KSC; **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS**